95 So.2d 39 (1957)
Louis P. SOUDELIER et al.
v.
Robert C. JOHNSON et al.
No. 4414.
Court of Appeal of Louisiana, First Circuit.
May 2, 1957.
*40 A. Deutsche O'Neal, Houma, for appellants.
Bienvenu & Culver, New Orleans, for appellees.
LOTTINGER, Judge.
This is a tort action arising out of an automobile collision which occurred on Christmas morning of 1952 in the Parish of Lafourche.
The petition alleges that on the day aforementioned the plaintiff Louis P. Soudelier was driving his Ford automobile at about 8:30 A.M. at a speed of about 35 miles per hour on U. S. Highway No. 90 from Thibodaux, Louisiana, in the direction of New Orleans, Louisiana, when he was involved in a head-on collision with a Chevrolet automobile owned by one Charlie Walker and driven at the time by one Clarence Gaston who was proceeding from New Orleans, Louisiana, in the direction of Raceland, Louisiana and who, suddenly and without warning, swerved from his lane of travel directly into the path of Soudelier's vehicle. It is further alleged that a Buick automobile owned and driven by defendant Robert C. Johnson had been following the Soudelier vehicle and that it collided with the rear of same simultaneously with the head-on collision.
The plaintiffs are (1) Louis P. Soudelier, individually, as head and master of the community existing between him and Mrs. Lucille Theriot Soudelier and for and on behalf of and as natural tutor of the minors Corinne, Susan and Richard Soudelier, (2) Mrs. Lucille Theriot Soudelier and (3) Northern Assurance Company, Ltd., Soudelier's accident insurer and subrogee. Joined as defendants were (1) Charlie Walker, (2) Clarence Gaston, (3) Robert C. Johnson and (4) the latter's liability insurer, Globe Indemnity Company of New York.
A companion suit was filed by Joseph A. Theriot, individually, and on behalf of his minor children Gail Theriot and Linda Theriot, who were passengers in the Soudelier automobile, and both suits were consolidated for trial.
It appears that the defendant Charlie Walker was never served and that the defendant Clarence Gaston, though served, entered no defense to the action. An answer was filed by Johnson and his insurer who, while admitting that Soudelier just prior to the accident was proceeding in his lane of travel at a speed not in excess of 35 miles per hour, denied any negligence whatsoever on the part of Johnson.
A preliminary default was entered against Gaston. Trial was then had on the merits and the case is now before us on an appeal taken by the plaintiffs from a judgment confirming the default against Gaston, but dismissing the suit insofar as Johnson and the Globe Indemnity Company are concerned.
Clarence Gaston has made no appearance in this Court and, of course, the judgment appealed from cannot be amended in his favor. We might point out, however, that the record affirmatively shows that he was drunk, left his lane of travel running directly *41 into Soudelier's car substantially as alleged and was, therefore, properly cast in damages by the Court below. The question presented by the appeal, therefore, concerns the negligence, if any, of the defendant Johnson.
Called on cross-examination by counsel for plaintiffs Johnson testified that on the morning of the accident he was driving his 1952 model Buick Roadmaster automobile in the direction of New Orleans. This gentleman stated that he was very familiar with the road, which appears at the site of the accident to have been some two miles east of Raceland on U. S. Highway No. 90 and that he had been driving it for years, ever since he had been a child, and that, although at the time of the trial he was a resident of South Carolina, he was actually a native of Morgan City in the Parish of St. Mary. He described the site of the accident as being on a straight stretch of road, a "good piece down" from that spot where the pavement ends and the blacktop begins. He estimated that from the standpoint of feet the site would have been 1,000 or 1,500 feet from the point where the pavement stopped and that he was driving at a moderate speed in the vicinity of 45 or 50 miles per hour. He stated "I know for sure I haven't drove more than 45 or 50 miles an hour then because the weather was bad at that time." Just before the accident he had passed another vehicle, that belonging to a Mr. Lococo who had been ahead of him. He stated that after passing this gentleman he reduced his speed and proceeded to follow the plaintiff, Mr. Soudelier, at a distance of 150 to 200 feet behind him. When asked if at that time he was catching up with Mr. Soudelier, the plaintiff stated that he was not, but had reduced his speed and was only following him. Further, he stated that there was oncoming traffic which he saw.
This witness gave the following version of the accident:
"Q. What oncoming traffic did you see at the time after you passed Mr. Lococo's car before the accident happened? A. I passed Mr. Lococo and the road was pretty clear. I saw Mr. Soudelier for quite a piece. There was traffic coming. I was in the line of traffic. All of a sudden these two colored fellows from New Orleans driving a Chevrolet, they pulled out and hit Mr. Soudelier. A head-on collision and turned on the side of a ditch.
"Q. How far were you back of the Soudelier car at the time the collision took place? A. About 150 feet, sir.
"Q. Were you going 45 miles an hour at that time? A. Yes, sir, the same speed as Mr. Soudelier. I was following Mr. Soudelier.
"Q. You were not driving faster than Mr. Soudelier? A. No, sir. I wasn't in no rush. I had plenty of time to get to work. I had to be at work the next morning.
"Q. Would you mind describing as well as you can recall just exactly what this automobile did that Mr. Soudelier had this accident with? A. Yes, sir. I can describe that. These two colored fellowsI was following Mr. Soudelier at a distancethey come out of their lane and hit Mr. Soudelier's car head-on. It stopped both cars dead, practically, and the colored fellows rolled over in the ditch. The Soudelier car stopped facing them crossways the highway. I applied my brakes right away and the car started sliding. It slid until I hit Mr. Soudelier. I seen Mrs. Soudelier go through the air. I saw where she layed on her back in the opposite lane of traffic. I rode my brakes until I hit. My car hit the Soudelier car's right rear wheel. I layed him along side the colored fellow's car. I landed opposite of Mrs. Soudelier and the wreck, the two front wheels on the soft shoulder of the road in the opposite lane.

*42 "Q. As I understand, you have described this section of the road as rather straight, is that right? A. Yes, sir.
"Q. And you can see a long way down the highway? A. Pretty far. Yes, sir.
"Q. Would you mind estimating the distance between the Soudelier automobile and this colored man at the time when the colored man first indicated that he was going to do some wrong driving? A. The colored fellow was right up of Mr. Soudelier at the time when he pulled out of his lane. It was a head-on collision. He lost control of the car and hit Mr. Soudelier head-on, stopping Mr. Soudelier to a dead stop. It looked like both cars stopped dead.
"Q. Did you see any signs along that highway warning traffic to go slow, if raining, slippery road? A. I can't say that I have. I am cautious when it rains especially on blacktop. I don't like a black top road. It's the first collision I have ever had.
"Q. Are you saying that at the time realizing a black top road is dangerous when sprinkling and raining? Was it sprinkling or raining at that time? A. It was drizzling rain.
"Q. And you were well acquainted with this area? A. Yes, sir."
Testifying on direct examination in his own behalf, Johnson stated that "he remembered passing the Lococo automobile a good piece before the collision," which he described as being a half mile or better. He stated that after accelerating to possibly 55 or 60 in order to pass this vehicle, he reduced his speed and fell back in the lane of traffic staying ahead of him at a speed of from 40 to 45 miles per hour. He stated that he saw the Lococo vehicle then in his rear view mirror at which time it was about 150 to 200 feet behind him and at the same time the Soudelier car was approximately the same distance ahead of him. He stated that he was not overtaking the Soudelier car. He stated that the vehicles remained in these respective positions for a distance of approximately 1,500 feet and that they proceeded in that manner onto the blacktop until all vehicles were on the blacktop portion. When Gaston pulled out he stated he was 150 to 200 feet from the Soudelier car at which time it looked to him as though Gaston pulled out from behind a car. He stated that when the collision occurred, he applied his brakes immediately and that he did not think that Soudelier had had a chance to apply his brakes before the accident had occurred. After applying his brakes, he stated that he skidded directly ahead until he hit the right rear wheel of the Soudelier automobile. At that time Soudelier's car was faced to the right as one looked towards the direction of New Orleans. He stated that he applied his brakes and that he slid all the way until he hit the Soudelier vehicle. His speed at the time of the impact he estimated at being not more than 5 or 10 miles an hour. This witness stated that he was alone in his vehicle at the time of the accident.
Mr. William Lococo, who was called on behalf of the defendant, testified that on the morning of the accident he was en route to New Orleans and witnessed the occurrence of the collision. He identified a 4 page statement which he had given shortly after the accident. He stated that he had been driving in the direction of New Orleans at a speed of from 40 to 50 miles per hour, but that upon leaving the concrete portion of the roadway and entering the blacktopped portion, he decreased his speed to about 40 miles per hour. Before he hit the blacktop, he stated that he was passed by a Buick automobile driven by Mr. Johnson and that after this vehicle passed him he remained about 75 to 100 feet behind it. He placed the point of collision at from 300 to 400 feet from where the blacktop commenced. He stated that *43 he saw the Chevrolet driven by Gaston come across the road and collide with Soudelier's automobile. He stated that he put on his brakes, and when he noticed the figure of a woman lying in the road, he applied them hard enough to spin around with the result that he wound up facing the direction from which he had come. When asked if there was a car proceeding ahead of the Chevrolet automobile, the witness stated that he could not testify definitely whether there was or was not such a vehicle. He stated that when he saw the collision he only saw the plaintiff's vehicle and the Chevrolet collide and never did see the Buick collide with either the Ford or the Chevrolet. He stated that his car travelled a pretty good distance before coming to a stop and that actually he was afraid that he might run into the cars ahead.
The accident was investigated by Trooper H. J. Danos. Although he testified with respect to the positions of the vehicles after the accident and the distance the Soudelier car moved after being hit by the Johnson car, we do not find his testimony to be very helpful for, admittedly, his memory was very hazy on the subject and his entire testimony was based on his report which was, in turn, based on information given him by others.
The plaintiff Soudelier stated that he did not even know Johnson was involved in the accident until he was told about it later. The most that this witness could testify to with respect to Johnson's negligence was that "It was just one impact and that was all." In this connection the Lower Court made the following comment with reference to plaintiff Soudelier's testimony.
"Mr. Soudelier tried to give the impression that the head-on collision and the collision with the Johnson car were simultaneous. It is apparent, however, that Mr. Soudelier was momentarily `knocked out' because the first thing he remembers was finding the child, Gail Theriot, out of the car helping him to remove the other children from the car. (Tr. p. 55.) He was in a daze and did not appear to know what had happened. (Tr. p. 89.) He did not even know that his wife had been thrown out of the car and did not know where she was. (Tr. p. 55.)"
Gail Theriot, a passenger in the vehicle, stated also that there was but one impact. Mrs. Soudelier was knocked unconscious and knew nothing about the Johnson car being involved until after the accident had occurred and she had been removed to a hospital.
The trial judge was of the opinion that the accident occurred in the manner related by the defendant Johnson. There is nothing in the record to indicate any manifest error in his so finding and this brings the case under our holding in the case of Rhea v. Daigle, 72 So.2d 643, 651, as held by the trial judge. In the Rhea case we thoroughly discussed the law and the jurisprudence relative to a situation of this kind and we quote same as follows:
"The record clearly shows that the Rhea and Daigle automobiles came to a complete and sudden stop upon their collision. Under these circumstances, we think the ruling of the trial judge places upon Hebert a degree of care which is more strict than that required by our law and jurisprudence. Indeed, in the case of McDaniel v. Capitol Transport Co., La.App., 35 So.2d 38, relied on by the trial judge, which cited Hill v. Knight, La.App., 163 So. 727 quoted from Blashfield's Cyclopedia of Automobile Law as follows:
"`The only rule that can govern the interval to be maintained is that of reasonable care under the circumstances. The mere fact that a vehicle is moving in close proximity to a moving vehicle ahead and keeping up with it *44 does not of itself constitute negligence. In determining whether or not a driver was negligent in not maintaining a proper distance between his automobile and the one preceding him, the speed at which he was traveling, the condition of the road, the amount of traffic, the condition of his brakes, and his ability, acting with ordinary care, to stop his car if required to do so by a situation not produced by another's negligence should be considered.' (Emphasis supplied.)
"The facts in the McDaniel case show that the following vehicle was travelling fifty feet behind the lead car at a speed of thirty to thirty-five miles per hour; that it was raining and the pavement was slippery; that the lead car had reduced its speed to approximately five miles an hour in order to bring it to a stop in view of the fact that the driver of the lead car had noticed some cattle crossing the highway. Certainly the facts of that case are different from the facts in the instant case.
"The other case of Lynch v. Fisher, La.App., 34 So.2d 513, which the lower court relied upon is not apposite to the facts in the instant case. That was a case where a motorist ran into a parked truck on the highway at night and certainly the general rule requiring the driver of an automobile to have his vehicle under such control as to be able to bring it to a complete stop within range of his vision or the penetration of his lights when confronted by an obstruction or danger, was applicable.
"Also controlling here is the case of Reeves v. Caillouet, La.App., 46 So. 2d 373, wherein the court quoted with approval from Adams v. Morgan, La. App., 173 So. 540, which laid down the following rule:
"`The best and safest rule which it seems possible for the governing authorities and the courts to have formulated is the one which requires the driver of the car following another to maintain such speed and such distance from the lead car as to be able to meet the usual and ordinary movements of a car using the highway. Such in effect is the provision in our State Highway Regulatory Act, Rule 8(a) Section 3, Act No. 21 of 1932. Whilst he is expected to be prudent in following another, the driver of the car in the rear can anticipate a reasonable observance of the rules of the road and of driving, by the driver of the car ahead of him. The rule is thus tersely and appropriately stated in the recent publication, American Jurisprudence, Vol. 5, p. 656, § 280:
"`"The general rule that drivers of automobiles on public highways or the streets of municipalities must exercise reasonable care in the operation of their vehicles, that is, such care as a person of ordinary prudence would exercise under the same or similar circumstances, governs the reciprocal rights and duties of the drivers of cars proceeding in the same direction. The driver must keep a safe distance behind a vehicle ahead and must have his machine well in hand to avoid injury to the car ahead so long as the car ahead is being driven in accordance with the law of the road."
"`Blashfield, in his Cyclopedia of Automobile Law and Practice (Permanent Ed.) Vol. 2 p. 107, 931, lays down a rule much to same effect. According to the statement therein made, it is the duty of the driver in the rear to have his car under such control as not to interfere with the free use of the road "in any lawful manner" by the driver of the car ahead.'
"In the case of Stevenson v. Campbell, 17 La.App. 142, 134 So. 718, we find where the Second Circuit Court of Appeal of this State, held that no *45 driver is required to be on guard for unusual situations that might suddenly and unexpectedly arise. This case is likewise reported in 104 A.L.R. p. 488. That case involved a three car accident wherein the following vehicle was absolved of negligence, due to the sudden and unexpected occurrence.
"We likewise find in 104 A.L.R. at page 500, the following:
"`However, it has also been held that the driver of a trailing car is not required to adhere to the rule that he must be able to stop it within his clear range of vision, in instances where hazards arise that could not have been anticipated. Rankin v. Nash-Texas Co., Tex.Civ.App.1934, 73 S.W.2d 680. In this case, although the court stated: "In trailing other automobiles, a motorist must govern his speed or keep back a reasonably safe distance so as to provide for the contingency of the automobile in front suddenly stopping or decreasing its speed, so that he can stop or decrease his speed to avoid a collision, or can turn out safely to pass the vehicle in front. One cannot run down a vehicle proceeding in the same direction without having been guilty of some negligence in the operation of his own, unless it appears that the collision was due to the contributory negligence of the driver of the other vehicle. The collision, under ordinary circumstances, furnishes some evidence of negligent acts of omissions on the part of the driver of the trailing vehicle which ordinarily calls upon the driver of the rear vehicle to explain, and usually presents a question of fact for the determination of the jury," it held that where a motorist ran into the rear of another car when it was suddenly stopped because of the sudden and abrupt appearance of another automobile backing into its path, such a situation did not "present an ordinary circumstance of the front car stopping as to raise a presumptive issue of negligence of the operator of the rear vehicle." It was further held that the doctrine of res ipsa loquitor had no application where the record was silent as to any specific acts of negligence on the part of the rear motorist.
"`Similarly, in Cook Paint & Varnish Co. v. Hickling, 8 Cir., 1935, 76 F.2d 718, where defendant's truck came to an abrupt stop because of a mechanical breakdown, without any warning to the driver of the vehicle in the rear, it was held that the overtaking motorist, who was injured when his car collided with the truck ahead, could not be required to exercise the care of an ordinarily prudent person when confronted with an emergency, nor expected to adopt the wisest choice in his endeavor to avoid colliding with the vehicle ahead and therefore could not be held guilty of contributory negligence in failing to stop within "the assured clear distance ahead."' * * *
"We believe under the above quoted expressions that while the driver of the following vehicle is charged with driving so as to have his car under control to avoid foreseeable dangers and emergencies he is not to be charged with anticipating an emergency such as presented itself here."
Finding no manifest error in the judgment appealed from the same is affirmed.
Judgment affirmed.